IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2018

**STATE OF TENNESSEE v. JEREMY PERES DUNCAN**

**Appeal from the Circuit Court for Madison County**
**No. 16-256   Roy B. Morgan, Jr., Judge**

_____

**No. W2017-00529-CCA-R3-CD**

_____

The defendant, Jeremy Peres Duncan, was indicted for two counts of aggravated assault, one count of possession of cocaine with the intent to sell, one count of possession of cocaine with the intent to deliver, two counts of possession of a firearm during the commission of a dangerous felony, one count of being a felon in possession of a handgun, and one count of tampering with evidence. The defendant was convicted as charged for all of the offenses. The trial court sentenced the defendant as a Range II offender and imposed an effective twenty-four-year sentence. On appeal, the defendant argues the evidence was insufficient to support his convictions for aggravated assault, possession of cocaine with the intent to sell and/or deliver, and possession of a firearm during the commission of a dangerous felony. The defendant also challenges the trial court's evidentiary rulings regarding evidence of the defendant's gang affiliation. Finally, the defendant challenges the trial court's imposition of consecutive sentences. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Joshua B. Dougan, Jackson, Tennessee, for the appellant, Jeremy Peres Duncan.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jody Pickens, District Attorney General; and Aaron Chaplin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

While on patrol in Madison County, Tennessee on October 20, 2015, two police officers in an unmarked car passed the defendant and his co-defendant, Corbyn Davis, walking down the street. As they passed, the officers noticed a "bulge" in the defendant's waistband. When the officers made a U-turn and headed back in the defendant's direction, the defendant displayed a gun, but then fled the scene once the officers identified themselves. After a short pursuit, the officers apprehended and arrested the defendant and Mr. Davis. Subsequent to his arrest, the defendant was indicted for: two counts of aggravated assault, one count of possession of cocaine with the intent to sell, one count of possession of cocaine with the intent to deliver, two counts of possession of a firearm during the commission of a dangerous felony, one count of being a felon in possession of a handgun, and one count of tampering with evidence.

## I. Motion to Suppress

Prior to trial and at issue in this appeal, the State filed a notice of intent to use evidence of the defendant's gang membership "for the limited purpose of proving motive, intent[,] and clarification of the facts" as to the defendant's aggravated assault charges. According to the State, after his arrest, "the [d]efendant admitted that he was a Vice Lord" and "made a spontaneous statement that he thought the officers were members of the Crip[s] street gang." At trial, the State intended to assert that "this statement made to [the officers] proves motive and intent of [the] [d]efendant to commit aggravated assault by displaying his weapon toward[s] officers, which he thought were Crips." The State also sought to introduce photographs of the defendant's gang-related tattoos to corroborate his statements. In response, the defendant argued evidence of his gang membership was irrelevant and inadmissible under Rules 403 and 404(b) of the Tennessee Rules of Evidence. The defendant further asserted the statement he made to police officers violated his *Miranda* rights, arguing he "made the alleged statement at issue only in response to vigorous questioning by law enforcement personnel immediately after his arrest."[1] If the trial court ruled in favor of the State, the defendant requested the trial court limit the evidence "only to [the defendant's] statement to law enforcement personnel." These evidentiary issues, and others, were taken up at the motion to suppress hearing wherein the arresting officers testified on behalf of the State.

Investigator Kelly Schrotberger of the Jackson Police Department gang enforcement team testified he was on routine patrol with his partner in the Hatton Street area on October 20, 2015, when he encountered the defendant and Mr. Davis. As the officers passed the two men in an unmarked vehicle, Investigator Schrotberger noticed "one of the males had a large bulge in . . . the front of his pants area, which is commonly identified as a weapon or narcotics." As a result, the officers drove past the defendant

---

[1]*See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

- 2 -

and Mr. Davis and then turned around to approach the men head-on.  As the officers "got closer" to the men, the defendant "pulled his shirt up and exposed a weapon he had stuck in the front of his shirt."  Investigator Schrotberger explained the defendant "reached and grabbed the weapon and started removing the weapon from his waistband, pulling it in an upward direction."  As the defendant did so, the officers "stopped [their] car, jumped out, identified [themselves], and Mr. Davis and [the defendant] fled on foot from [them]."  Subsequently, both men were apprehended, arrested, and found with "narcotics in their possession."

After his arrest, the defendant was transported to the hospital where he told Investigator Schrotberger that he swallowed drugs during the pursuit.  Investigator Schrotberger further explained the defendant stated "the reason he pulled his gun out is because he thought we were Crip[s] gang members.  [The defendant] said that he saw our hats in the car and he thought our hats were tilted to a certain way."  The defendant also told the officers that he was a Vice Lord.  According to Investigator Schrotberger, the defendant offered this information while in the hospital, absent any questioning from the officers.  Specifically, Investigator Schrotberger stated that while in the hospital, "we're talking back and forth.  I'm not asking -- I didn't ask him any questions related to him pulling the gun or the drugs or anything."  Regarding the defendant's gang membership, Investigator Schrotberger testified the defendant "has numerous Vice Lord tattoos that are associated with the People Nation and the Vice Lords; he's documented in TDOC as a Vice Lord; he told me he was a Vice Lord; we spoke about it, a lot of things."  Investigator Schrotberger identified photographs he took of the defendant's tattoos, and, after being qualified as an expert in gang identification and analysis, he explained the tattoos on the defendant "identif[y] him within the prison system or on the street as a Vice Lord."

On cross-examination, Investigator Schrotberger stated he did not speak with the defendant on the scene of the arrest, but rather spoke to the defendant in the emergency room while he was receiving medical care.  Specifically, Investigators Schrotberger and Rhodes were in the hospital room with the defendant for about fifteen or twenty minutes during which "he had explained to [Investigator Schrotberger] why he showed us his weapon and everything."  The defendant was not read his *Miranda* rights while in the hospital because, according to Investigator Schrotberger, "I never -- I wasn't questioning him about the crime or what had just happened.  I didn't have any reason to read him his rights.  He was speaking freely to me."  Investigator Schrotberger additionally stated he did not read the defendant his *Miranda* rights prior to taking photographs of the defendant's tattoos at the gang enforcement office, but rather followed the "commonly used" policy of the gang enforcement team in taking the photographs.

Investigator Antonio Rhodes, who was patrolling the Hatton Street area with Investigator Schrotberger, then testified. Investigator Rhodes explained they "made a U-turn" to identify the defendant and Mr. Davis after seeing them walking down the street. Investigator Rhodes stated, "we were coming back toward them and we observed [the defendant] display a handgun to us, and then he actually put his hand on it and started to pull it out." The officers then "drew [their] firearms inside the car and [they] exited [their] vehicle immediately and told [the defendant and Mr. Davis] to get their hands up." The men, instead, fled the scene. Investigator Rhodes pursued the defendant and "observed him throw a firearm in some bushes and continue running."

Upon searching the defendant after his arrest, Investigator Rhodes found ".7 grams of crack cocaine in his right watch pocket of his jeans." Before leaving the scene, officers located the gun carried by the defendant, and he was then transported to the jail in a patrol car by another officer. According to Investigator Rhodes, the defendant "had actually vomited in the back seat of the patrol car, so [they] asked him what was wrong with him, and [the defendant] advised us that he swallowed half a gram of crack cocaine." Additionally, at the hospital, the defendant "was just having a conversation" with the officers when he stated "that the reason he did what he did [was] because he thought [the officers] were Crips, which is a street gang, a criminal street gang."

During cross-examination, Investigator Rhodes confirmed that he asked the defendant what was wrong after learning the defendant vomited in the patrol car. He further confirmed the statements made by the defendant at the hospital, regarding his membership in the Vice Lords and his belief that the officers were Crips. Investigator Rhodes testified these statements occurred absent a *Miranda* warning "because we weren't questioning him about the case." Rather, "[the defendant] made the statements himself." Finally, Investigator Rhodes stated that prior to the photographs of the defendant being taken, he believed the defendant signed a *Miranda* waiver and agreed to submit to the same.

Investigator Michael Byrd also testified, stating he relieved Investigators Rhodes and Schrotberger from the hospital. When he arrived, Investigator Byrd described the defendant as "laughing, joking, cutting up. . . . he was talking." Further, Investigator Byrd stated the defendant "started going over what happened that day, things like that, going through the chain of events." While Investigator Byrd sat with the defendant in the hospital, the defendant explained that he "didn't know [the investigators] were police. . . . He started to pull his gun or something and he thought they were some Crips or something, and then when he realized they were police, he threw his 4-5 and took off running or something like that." Investigator Byrd stated he did not read the defendant his *Miranda* rights because his "intent wasn't to ask him any questions."

- 4 -

Subsequent to the hearing, the trial court produced a written order addressing the various suppression issues raised during the hearing. In its order, the trial court granted the defendant's motion in limine "with regard to all statements made by [the] [d]efendant at Jackson-Madison County General Hospital in the presence of law enforcement on October 20, 2015." However, the trial court denied the defendant's motion in limine as to his statements concerning the "alleged motive for displaying a weapon made immediately after his apprehension on October 20, 2015." The trial court also denied the defendant's motion regarding his statement "concerning his ingestion of an illicit substance made in the presence of law enforcement at or near the Madison County Criminal Justice Center on October 20, 2015." Finally, the trial court denied the defendant's motion as to the "proposed photographs of [the] defendant's tattoos." The parties then proceeded to trial under this evidentiary framework.

## II.    Trial

At the outset of trial, the parties agreed to bifurcate the defendant's felon in possession of a firearm charge before proceeding with the evidence. Investigator Rhodes testified in greater detail about the interaction he had with the defendant on October 20, 2015. Specifically, he explained he was in the passenger's seat of an unmarked patrol vehicle driven by Investigator Schrotberger around 1:30 p.m. when they noticed two men walking down the street. The defendant, who was closest to the vehicle, "appeared to have a large bulge in his right waistband." The officers "weren't 100 percent positive" what the bulge was, so they turned around approximately 15 yards ahead of the men. As the officers drove back towards the men, Investigator Rhodes saw the defendant "pull[] his coat open and . . . proceed to pull out the firearm." He stated the defendant pulled the gun "probably where the muzzle was coming out of his waistband, the barrel of the gun." Both officers yelled "[g]un," "unholstered [their] weapons," and got out of the car. Upon exiting the car, the officers, wearing "vests with [']Police['] in about two-inch white letters," yelled "Police," and the defendant and Mr. Davis ran. Investigator Rhodes testified he and Investigator Schrotberger pulled their guns "because [they] felt threatened that [the defendant] was going to shoot [them], and [they] felt in danger for [their] lives."

The defendant and Mr. Davis ran in different directions. Investigator Rhodes pursued the defendant on foot down an alley. During the pursuit, he saw the defendant "throw the weapon" into "some bushes." After the defendant threw the weapon, Investigator Rhodes continued to chase him for another 75 yards before arresting the defendant in a residential back yard. Investigator Rhodes handcuffed the defendant, walked him back to the original scene, and searched him. Upon searching the defendant, Investigator Rhodes found crack cocaine in the defendant's right watch pocket, weighed it, and put it into an evidence bag for testing. According to the digital scale used at the

scene, the cocaine, packaged in "a little clear baggie," weighed 0.7 grams. Investigator Rhodes retrieved the defendant's gun, a .45 caliber semi-automatic, which was loaded with eight rounds. The defendant was then placed in a patrol car and taken to jail. Both the cocaine and the handgun were entered into evidence at trial.

While being transported to jail, the defendant vomited in the back seat of the patrol car. Investigator Rhodes asked the defendant "what was wrong with him, and [the defendant] advised [him] that he swallowed a half a gram of crack cocaine while [Investigator Rhodes] was chasing him." The defendant was then taken to the hospital. Two days later, Investigators Rhodes and Schrotberger read the defendant his *Miranda* rights and conducted a recorded interview of the defendant in their office, portions of which were played for the jury at trial. During the interview, the defendant stated he carried a firearm "because he did sell drugs." Further, the defendant again admitted to swallowing cocaine on the date of his arrest.

Investigator Schrotberger then testified, providing additional detail surrounding the defendant's arrest. He explained that as he drove an unmarked police vehicle, he noticed the defendant and Mr. Davis walking down the street. Investigator Schrotberger saw "a bulge" in the defendant's waistband and stated "in [his] experience it's guns or drugs or someone is trying to hide something in that area." Accordingly, the officers turned around in order "to get a better look." As they drove back towards the defendant and Mr. Davis, the defendant reached for a gun. Investigator Schrotberger explained, "as soon as I back out and start back towards him, [the defendant] reaches down towards his waistband. I see his shirt come up. I can see the handle of the weapon. [The defendant] grabs the handle of the weapon. The closer we get, he starts pulling the gun." The officers reached for their own guns and exited the vehicle. As they did, "[the defendant] had the weapon pulled up. He hadn't pointed the gun at us yet. He was pulling the gun from his pants, and we jumped out and started yelling, 'Police, police.'" Investigator Schrotberger was "very much so" in fear of the defendant and "could tell [the defendant] was surprised that we were the police." The defendant then fled down an alley as Investigator Schrotberger pursued Mr. Davis. Both the defendant and Mr. Davis were arrested, searched, and transported to jail.

Investigator Schrotberger next saw the defendant in the hospital after his arrest, and then two days later, he participated in a recorded interview of the defendant. Prior to the recorded interview, the defendant signed a waiver of rights, which was entered into evidence. During the interview, the defendant explained that when he saw the officers drive towards him, "he thought that [the officers] were Crip[s] gang members which is a rival gang to [the defendant]." As a result, the defendant displayed his gun before realizing the men in the car were police officers. Once the officers identified themselves, the defendant "took off and ran with the gun." During the interview, the defendant

further explained he "sells drugs and he's part of a gang." The defendant admitted to being in a rival gang to the Crips and allowed officers to photograph his gang-related tattoos, which identified the defendant as a member of the Vice Lords.

Investigator Schrotberger also testified the defendant admitted to selling crack cocaine and to swallowing cocaine when he was being chased by Investigator Rhodes on October 20, 2015. Additionally, upon arrest, the defendant was found with "crack cocaine baggied in three or four different bags which shows distribution or sale, that you would sell crack cocaine." Finally, the defendant stated in the interview, "I got caught with what I got caught with," which Investigator Schrotberger believed referred to "[t]he crack, [and] the gun."

On cross-examination, Investigator Schrotberger stated the defendant never pointed the gun at him during their exchange, he did not have any cash on him at the time of his arrest, and he was not conducting a drug deal when the officers approached him. Investigator Schrotberger believed the defendant was being truthful during the recorded interview. On redirect examination, Investigator Schrotberger stated he believed the defendant possessed the items found on him with the intent to sell them based upon "[t]he way [the defendant] had [the cocaine] packaged in his pocket and that he told me he sold drugs." Furthermore, Investigator Schrotberger testified he was afraid when the defendant displayed his gun, stating, "I didn't know if he was going to shoot me or me and my partner [were] going to die."

Peter Hall, a special agent for the Tennessee Bureau of Investigation and an expert in forensic chemistry and the identification of drugs, then testified. Agent Hall weighed and tested the substance found on the defendant on the day of his arrest finding, the substance to be 0.35 grams of cocaine.[2] His report was entered into evidence. The State then rested its case after which the defendant did not present any additional proof.

The jury found the defendant guilty of two counts of aggravated assault, one count of possession of cocaine with the intent to sell, one count of possession of cocaine with the intent to deliver, two counts of possession of a firearm during the commission of a dangerous felony, and one count of tampering with evidence. The defendant then entered an open plea to one count of being a felon in possession of a handgun. The trial court sentenced the defendant as a Range II, multiple offender with 35% release eligibility for his crimes. Specifically, the trial court sentenced the defendant to ten years for each aggravated assault conviction (Counts 1 and 2). The trial court merged the defendant's

---

[2]Pursuant to an agreed order by the parties, the original indictment was amended to remove the amount of cocaine from Counts 3, 4, 5, and 6. Thus, ".5 grams or more of'" was removed from the indictment.

convictions for possession of cocaine with the intent to sell and possession of cocaine with the intent to deliver (Counts 3 and 4), and sentenced the defendant to an effective ten years for the convictions. The trial court merged the defendant's convictions for possession of a firearm during the commission of a dangerous felony (Counts 5 and 6), and imposed a four-year sentence for each.[3] Under the plea, the trial court imposed a ten-year sentence for the conviction of being a felon in possession of a handgun (Count 7). Finally, the trial court imposed a ten-year sentence for the defendant's tampering with evidence conviction.[4] The trial court ran Counts 1, 2, 7, and 8 concurrently to one another, ran the merged Counts of 3 and 4 consecutively to Counts 1, 2, 7, and 8, and ran the merged Counts of 5 and 6 consecutively to Counts 3 and 4, resulting in an effective twenty-four-year sentence to be served in the Tennessee Department of Correction.[5] The defendant filed a motion for new trial which was denied by the trial court, and this timely appeal followed.

## ANALYSIS

### I. Evidence Relating to the Defendant's Gang Membership

On appeal, the defendant asserts the trial court erred in admitting "testimony concerning his gang membership, and that this error fatally prejudiced his trial." Specifically, the defendant contends "testimony concerning gangs – and [the defendant's] association therewith – permeated the trial" and suggests the officers' testimony regarding their work in the gang unit resulted in prejudice. Upon our review of the record, however, we disagree with the defendant's categorization of the gang-related evidence produced against him.

The proof at trial centered on the testimony of the arresting officers, Investigators Schrotberger and Rhodes. Each officer testified he served as a member of the gang unit of the Jackson Police Department. In providing their credentials, both officers explained their work revolved around gang violence which included gun, narcotics, and homicide cases. As noted by the State, the defendant did not object to this testimony at trial. Accordingly, any objection as to this testimony has been waived. Tenn. R. App. P. 36 ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Despite the apparent waiver, the defendant still is not entitled to relief on the merits of this claim because the officers'

---

[3]The trial court noted that, by law, three of the four years imposed for these crimes must be served at 100%.

[4]Various fines were also imposed by the jury in reaching its verdicts.

[5]The defendant's twenty-four-year sentence was imposed consecutively to Hardeman County Circuit Court Docket No. 09-01-0792.

testimony amounted to nothing more than a basic description of their job duties. The officers' testimony is no different than a medical examiner testifying about his work in examining deceased bodies. The defendant is not entitled to relief as to this issue.

Additional gang-related evidence emerged when Investigators Schrotberger and Rhodes testified to the defendant's statements regarding his membership in the Vice Lords and to believing the officers were Crips at the time he displayed his gun. A recording of the interview wherein the defendant admits to the same was also entered into evidence. Based upon this evidence, the defendant asserts "it is reasonably likely that [Investigators] Rhodes' and Schrotberger's testimony caused the jury to assign guilt to [the defendant] because of an 'apparent propensity or disposition to commit a crime.'" *State v. Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App. June 27, 2001). The record, however, does not support this assertion.

In ruling on the defendant's suppression motion, the trial court stated the defendant's statements concerning the "alleged motive for displaying a weapon" at the officers was "a voluntary utterance by [the] [d]efendant, and thus outside the scope of *Miranda* protection." Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Matthew T. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (Tenn. Crim. App. Sept. 13, 2012). Upon our review of the evidence, nothing in the record preponderates against the trial court's assessment that the defendant's statements concerning his gang membership and his motives at the time of the crimes were admissible. *Id.* The defendant is not entitled to relief.

Furthermore, the trial court provided the jury with a limiting instruction on evidence relating to the defendant's gang membership. Specifically, the trial court instructed:

> If you find from the proof that the defendant made any statement referencing "gang," you may only consider such proof for the purpose of the State's burden of proof as to motive for Counts 1 & 2 [aggravated assault].
>
> You may not consider any proof of "gang" reference for any other purpose.

We presume the jury followed the trial court's instructions. *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001); *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006). Though the defendant's membership in the Vice Lords gang and his belief the officers were Crips at

the time of the assault were discussed throughout the trial, the trial court ruled on its admissibility during the suppression hearing and provided the jury with a limiting instruction regarding the gang-related evidence. As such, the defendant has failed to show how the general mention of Investigators Schrotberger's and Rhodes' work in the gang unit of the Jackson Police Department or the defendant's own statements regarding his gang membership and his motive for pulling his weapon on the officers prejudiced the trial. The defendant is not entitled to relief.

## II. *Sufficiency of the Evidence*

The defendant next challenges the sufficiency of the evidence as to his convictions for aggravated assault, possession of cocaine with the intent to sell and/or deliver, and possession of a firearm during the commission of a dangerous felony.[6] We will address each conviction in turn.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

---

[6]The defendant does not contest the sufficiency of the evidence as it relates to his convictions for being a felon in possession of a handgun or tampering with evidence. As such, they are not addressed in this appeal.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)).  "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

### A. *Possession of Cocaine with the Intent to Sell and/or Deliver*

In attacking the sufficiency of the evidence as to his convictions for possession of cocaine with the intent to sell and/or deliver, the defendant alleges the testimony of Investigators Rhodes and Schrotberger, who each "conceded that it was unknown what [the defendant] intended to do with the cocaine," and the lack of "other items commonly possessed by drug dealers, such as scales, drug paraphernalia, or cash," illustrate the evidence produced at trial was insufficient to support these convictions.  Upon our review of the record, we disagree.

Tennessee Code Annotated section 39-17-417 makes it a Class C felony to knowingly possess a Schedule II controlled substance with the intent to sell or deliver the controlled substance.  Tenn. Code Ann. § 39-17-417.  One acts knowingly "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist."  Tenn. Code Ann. § 39-11-302 (b).  Cocaine is a Schedule II controlled substance.  Tenn. Code Ann. § 39-17-408.  In this context, "[i]t may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing."  Tenn. Code Ann. § 39-17-419; *State v. Holt*, 691 S.W.2d 520, 522 (Tenn. 1984).

Here, the evidence at trial showed that after fleeing from Investigators Schrotberger and Rhodes, the defendant was arrested, searched, and found with drugs in his pocket.  According to Investigator Schrotberger, the defendant had crack cocaine "baggied in three or four different bags."  Investigator Schrotberger opined this packaging indicated the defendant intended "distribution or sale" of the cocaine.  Similarly, Investigator Rhodes testified he found crack cocaine in the defendant's pocket, which was packaged in "a little clear baggie."  Investigator Rhodes weighed the drugs on the scene of the defendant's arrest, finding the substance and packaging to weigh 0.7 grams.  Agent Hall testified the cocaine found on the defendant after his arrest amounted to 0.35 grams, his report was entered into evidence at trial.  Furthermore, during a recorded interview, the defendant admitted to selling drugs, carrying a gun, and swallowing "half a gram" of cocaine during his encounter with the officers.  The

defendant also explained he carried a gun because he sold drugs. Accordingly, sufficient evidence exists to show the defendant possessed cocaine with the intent to sell and/or deliver.

In support of his insufficiency argument, the defendant relies on an alleged discrepancy in the testimonies of Investigators Rhodes and Schrotberger wherein, despite the above outlined evidence, the defendant asserts they "conceded that it was unknown what [the defendant] intended to do with the cocaine." We, however, find this argument misplaced as the officers' definitive statements do not overcome the overwhelming amount of direct and circumstantial evidence produced by the State in support of these convictions. Furthermore, any inconsistencies in the officers' testimonies alleged by the defendant were resolved by the jury in reaching their verdict. This Court will not reweigh the evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Accordingly, sufficient evidence exists to show the defendant possessed cocaine with the intent to sell and/or deliver. The defendant is not entitled to relief.

### B. *Possession of a Firearm during the Commission of a Dangerous Felony*

In conjunction with his previous argument, the defendant contends, "if [he] did not intend to sell or possess the cocaine, then he did not commit the predicate dangerous felonies contained in counts 5 and 6," which consist of his convictions for possession of a firearm during the commission of a dangerous felony. We, again, disagree. "It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." Tenn. Code Ann. § 39-17-1324 (a). One such "dangerous felony" is possession with the intent to sell or distribute a controlled substance. Tenn. Code Ann. § 39-17-1324 (i)(1)(L).

Here, it is undisputed the defendant carried a gun at the time of the exchange with Investigators Rhodes and Schrotberger. Both officers testified they saw "a bulge" in the defendant's waistband from which he displayed and then pulled a gun. Investigator Rhodes saw the defendant "throw a firearm in some bushes," and recovered the same after arresting the defendant. As explained above, both Investigator Rhodes and Schrotberger testified a search of the defendant produced crack cocaine packaged in baggies which indicated a plan of sale or distribution, thus establishing the underlying dangerous felony needed to sustain the defendant's present convictions. The defendant also admitted to carrying a gun and to selling drugs during his interview with the officers. Accordingly, not only is the evidence sufficient to support the defendant's convictions for possession of cocaine with the intent to sell and/or deliver, but it is also sufficient to support his convictions for possession of a firearm during the commission of a dangerous felony. The defendant is not entitled to relief.

## C. Aggravated Assault

The defendant also contends the State failed to prove the elements of aggravated assault beyond a reasonable doubt. More specifically, the defendant argues the State failed to prove that Investigators Schrotberger and Rhodes reasonably feared imminent bodily injury, arguing "they simply did not have time to become reasonably afraid." The evidence produced at trial shows otherwise.

The defendant has committed an assault when he "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101 (a)(2). The defendant has committed an aggravated assault when the assault "[i]nvolved the use or display of a deadly weapon." Tenn. Code Ann. § 39-13-102 (a)(1)(A)(iii). Here, Investigators Rhodes and Schrotberger testified they feared the defendant when he pulled his gun on them. Specifically, the officers explained they approached the defendant after noticing "a bulge" in his waistband. As they did so, the defendant pulled the gun from his waistband, and the officers, in turn, pulled their own weapons and attempted to identify themselves as police to the defendant. Investigator Rhodes testified he "felt threatened that [the defendant] was going to shoot [them], and [they] felt in danger for [their] lives," and Investigator Schrotberger testified he "didn't know if [the defendant] was going to shoot me or me and my partner are going to die." Though the defendant then fled from the officers, the timing of the exchange does not eliminate the officers' fear. Furthermore, the defendant told the officers he pulled his gun because he thought they were members of a rival gang, further establishing the threatening actions of the defendant against the officers. After reviewing the evidence in the light most favorable to the State, we hold that the proof presented at trial was sufficient for a rational trier of fact to find the defendant committed the aggravated assaults of Investigator Rhodes and Investigator Schrotberger. The defendant is not entitled to relief.

## III. Sentencing

Finally, the defendant argues the trial court erred in imposing "partially consecutive sentences resulting in an effective [twenty-four]-year sentence." When an accused challenges the length, manner, or range of a sentence, this Court will review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). This Court also reviews consecutive sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W. 3d at 707; *Pollard*, 432 S.W.3d at 859-60. The party appealing a sentence bears the burden of establishing that the sentence was improper.

Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

In imposing a sentence, the trial court must also consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement by the defendant in his own behalf. Tenn. Code Ann. § 40-35-210 (b). In addition, the principles of sentencing provide that the sentence should be no greater that that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. *See* Tenn. Code Ann. § 40-35-103 (2), (4). To provide meaningful appellate review, the trial court must state on the record its reasons for the sentence chosen. Tenn. Code Ann. § 40-35-210 (e).

After doing so, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210 (d)). The trial court shall consider, but is not bound by, the provision that "[t]he minimum sentence within the range of punishment is the sentence that should be imposed . . . [and] should be adjusted, as appropriate by the presence or absence of mitigating and enhancement factors." Tenn. Code Ann. § 40-35-210 (c); *Carter*, 254 S.W.3d at 346. A non-exclusive list of mitigating and enhancement factors are provided in Tennessee Code Annotated sections 40-35-113 and -114. The weighing of both mitigating and enhancement factors is left to the trial court's sound discretion, but a trial court's misapplication of a mitigating or enhancement factor will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709.

Further, Tennessee Code Annotated section 40-35-115 "creates several limited classifications for the imposition of consecutive sentences." *State v. Moore*, 942 S.W.2d 570, 571 (Tenn. Crim. App. 1996). A trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Pursuant to statute, consecutive sentencing is warranted when "[t]he defendant is an offender whose record of criminal activity is extensive[,]" and if "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no

hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115 (b)(2), (b)(4). In imposing consecutive sentences based upon a dangerous offender status, it is necessary that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn.1999) (stating that the *Wilkerson* findings that the sentences are necessary to protect the public and reasonably relate to the severity of the offenses apply only to consecutive sentences involving dangerous offenders).

Here, as noted by the State, the defendant takes no issue with the length, manner, or range of sentence imposed by the trial court, and our review of the record reveals no abuse of discretion as to the same. Rather, the defendant challenges the trial court's imposition of partial consecutive sentencing, claiming the effective twenty-four-year sentence was unjust because the defendant "inflicted no bodily injury or death, and the amount of cocaine that he possessed was quite small." This argument, however, is without merit.

In sentencing the defendant, the trial court complied with the purposes and principles of sentencing before imposing a twenty-four-year sentence. Further, the trial court found the defendant was eligible for consecutive sentencing based upon his extensive criminal history and its determination that the defendant is a "dangerous offender." Tenn. Code Ann. § 40-35-115 (b)(2), (b)(4). The trial court explained:

> The Court has considered the evidence that was presented during the course of the trial and the sentencing hearing today and the presentence report and other exhibits made, the certified copies of prior convictions. I've considered the principles of sentencing guidelines, arguments of counsel on both sides today, and, of course, the nature and characteristics of the criminal conduct involved and mitigating and enhancing factors.

> . . .

> As far as we know, Counts 5 and 6 are mandated to be consecutive, and I'm going to order the whole sentence be consecutive, but I'm going to order that in considering consecutive sentencing. The State's filed that motion, and I'm going to make reference to that.

> The State in their motion stated that the [d]efendant is an offender whose record of criminal activity is extensive. Of course, the [d]efendant . . . knows his record, and the [c]ourt under these circumstances finds that to

- 15 -

be an extensive record, and I can also take into consideration the convictions that resulted from this jury trial in weighing in his priors plus this and determine the extensive record, and it is in this case.

As to the next factor, the State argued that the [d]efendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime at which the risk to human life is high. The [c]ourt if it applies that would also have to find the following three circumstances apply:

Number 1, that the circumstances surrounding the commission of the offense are aggravated; confinement for an extensive period of time is necessary to protect society from the [d]efendant's unwillingness to lead a productive life and the [d]efendant's resort to criminal activity in furtherance of an anti -social lifestyle; and, C, the aggregate length of the sentence reasonably relates to the offense of which the [d]efendant stands convicted.

The [c]ourt does find under the facts of the case, noting the circumstances, the [d]efendant walking down the street with a gun in his belt and displaying it, for the reasons argued and presented during the course of this trial, the [c]ourt does find that all three of those do apply, the A, B and C under that section, that the [d]efendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime to which the risk to human life is high. So I find the three factors apply under that under the facts of this case, which would allow in the discretion of the [c]ourt consecutive sentencing. The burden of proof on the consecutive is discretionary and it's by preponderance of the evidence.

In finding the defendant eligible for consecutive sentencing, the trial court noted the defendant displayed a gun to the officers because he believed them to be members of a rival gang. As a result, the trial court found the defendant to be a dangerous offender and stated his behavior indicated no regard for human life and that he had no hesitation for committing a crime where the risk to human life was high. Additionally, the record illustrates the defendant's extensive criminal history, spanning from 2006 through 2015 and consisting of at least five felonies and several misdemeanors in addition to his current convictions. Accordingly, we conclude the criteria relied upon by the trial court are explicit in the record and support the court's consecutive sentencing as to the defendant's convictions. The trial court did not abuse its discretion in imposing consecutive sentences for the convicted offenses, and we affirm the trial court's sentence.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE